UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JESSE A. PAYNE,

          No. 13-13561

    Plaintiff,          District Judge MATTHEW F. LEITMAN

v.          Magistrate Judge R. STEVEN WHALEN

COMMISSIONER OF
SOCIAL SECURITY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. The parties have filed cross motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED [Docket #13] and that Plaintiff's Motion for Summary Judgment be DENIED [Docket #9].

## I.   PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on February 3, 2011, alleging disability as of June 3, 2010 (Tr. 106-112, 113-117). Upon initial denial of the claim, Plaintiff requested an

-1-

administrative hearing, held on February 13, 2012 in Lansing, Michigan before Administrative Law Judge ("ALJ") Paul W. Jones (Tr. 24). Plaintiff, unrepresented, testified, (Tr. 28-52), as did vocational expert ("VE") Joanne Pfeffer (Tr. 56). On March 13, 2012, ALJ Jones found Plaintiff not disabled (Tr. 20).

On June 22, 2013, the Appeals Council declined to review the administrative decision (Tr. 1-3). Plaintiff filed suit in this Court on August 19, 2013.

## II. BACKGROUND FACTS

Plaintiff, born May 29, 1979, was 32 at the time of administrative decision (Tr. 20, 106). He completed high school (Tr. 135) and worked previously as gas station clerk, corrections officer, construction worker, and factory worker (Tr. 136). He alleges disability as a result of vasodepressor neurocardiogenic syncope (Tr. 135).

### A. Plaintiff's Testimony

Plaintiff offered the following testimony:

He lived in a single-family home with his wife and son (Tr. 28). His house was currently in foreclosure (Tr. 29). He stood 5' 8" and weighed about 260 pounds (Tr. 29). He attributed a recent weight gain of 30 pounds to inactivity (Tr. 30). In addition to receiving a GED, he had earned 52 college credits required for his employment with the Michigan Department of Corrections ("MDOC") (Tr. 30). He was currently taking three classes at a local community college toward an associate's degree in business (Tr. 31). He took online classes because "passing out in class" would create a disturbance (Tr. 33). He had been

advised to find work that would accommodate his cardiac condition (Tr. 32). The occupations recommended were unlike his work background as a corrections officer and construction worker and were "all new" to him (Tr. 32).

Plaintiff continued to drive with an unrestricted license (Tr. 33). His doctor had not forbidden him to drive but advised him to avoid driving (Tr. 33). He had not passed out while driving (Tr. 33). At the times he had "gotten sick" while driving, he would "pull over, throw the car in park and wait it out or call someone . . ." (Tr. 33). The episodes generally started with the "warning sign" of partially blurred vision, then shortness of breath and nausea, followed by dizziness, loss of balance, and on occasions, loss of consciousness (Tr. 34). He stated that he experienced temporary immobility every month to month-and-a half (Tr. 34). Typically, it took one day to recover from the episodes (Tr. 35-36). He experienced limited relief from prescribed medication (Tr. 36).

Plaintiff no longer exercised, noting that he had problems motivating himself (Tr. 37). He would not be able to perform desk jobs working for the MDOC because his condition would compromise the security of other workers, but was open to the possibility of holding an office job in the private sector (Tr. 39). He had refrained from applying for private sector jobs, citing decreased earnings, transportation problems, sick days, and his "liability" to prospective employers (Tr. 40).

His former work as a corrections officer required him to split his time between "making the rounds" and desk work (Tr. 46). He could read, write, and perform simple math

(Tr. 48). He received $4,000 each month from his long term disability insurer, noting that the insurer had required him to apply for Social Security benefits (Tr. 48). He was also applying for Social Security benefits because he was at "a cross-roads" in regard to his functional abilities (Tr. 49). His house was not in foreclosure due to financial need, but rather because of a dispute pertaining to whether the current mortgage assignee was entitled to collect payments (Tr. 49).

Following the VE's job testimony (see below) Plaintiff stated that he would be unable to perform the job of surveillance monitor because of transportation limitations and his need to call in sick regularly (Tr. 56). In response to the ALJ's observation that University of Michigan Hospital records stated that Plaintiff had only four syncopal episodes a year, Plaintiff testified that he had "way more near syncopal episodes" averaging "two and four near syncopal episodes a week . . ." (Tr. 57). He stated that during the episodes he was non-responsive and was unable to hold a conversation, followed by extreme fatigue for "a day to a day and a half" (Tr. 57). He pointed out that his functional limitations included a preclusion on activities near open water, hot showers, and operating power tools (Tr. 58). Plaintiff acknowledged that he had not attempted to procure other work, stating that because of his condition, he was unable to even care for his own child (Tr. 59). He testified that he anticipated going back to work after he got his "medications under control" (Tr. 60). He characterized his current situation as "completely unplannable and completely inconvenient" (Tr. 60).

**B. Medical Records**

In March, 2010, Plaintiff sought emergency treatment for flu-like symptoms (Tr. 202). He received fluids intravenously before being released (Tr. 207). June, 2010 neurology consultation notes state that during the workday, Plaintiff felt lightheaded, hot, and sweaty, but his symptoms improved by the time he arrived at the emergency room (Tr. 189). He denied numbness, double vision, disorientation, or confusion (Tr. 189). He was diagnosed with "near syncope" (Tr. 190). An ultrasound of the liver was normal (Tr. 211-212). Imaging studies of the chest and heart were also normal (Tr. 213). A neurological examination was unremarkable (Tr. 190). An EKG and a CT of the head were negative (Tr. 193, 200).

In July, 2010, Plaintiff sought emergency treatment after developing a headache, dizziness, and nausea (Tr. 182). Plaintiff reported previous reactions to Dilaudid (Tr. 183). A physical examination was unremarkable (Tr. 184). The discharge summary states a "suspected transient ischemic attack" and "possible migraine with sensory aura" (Tr. 187). Edward Robles, M.D. noted Plaintiff's report of long-term migraine headaches and a current facial droop on the right (Tr. 178). Dr. Robles noted the absence of a facial droop, extremity weakness, and confusion (Tr. 178). He noted that a recent CT of the head was unremarkable (Tr. 179). Dr. Robles recommended taking one 81 milligram aspirin a day (Tr. 180). July, 2010 imagining studies of the head were negative for aneurysm and occlusive vascular disease (Tr. 176). An August, 2010 "table tilt" test resulted in lowered blood pressure and

near syncopal symptoms (Tr. 174, 259). Plaintiff was advised to increase his fluid levels and avoid caffeine (Tr. 174, 222). An examining source noted that stress exacerbated Plaintiff's physical conditions (Tr. 223). Dr. Robles found that Plaintiff should remain off work until syncopal episodes resolved (Tr. 218, 220). In September, 2010, Dr. Robles prescribed Inderal for migraine headaches (Tr. 217).

In November, 2010, Dr. Robles prescribed Zoloft for the conditions of "syncope/near syncope" (Tr. 216). He noted a secondary diagnosis of migraines (Tr. 216). He opined that Plaintiff could perform restricted work as of January 5, 2011, but recommended against work involving inmates, climbing "tall heights," or driving within six months of a blackout (Tr. 216, 231). Plaintiff reported an episode of dizziness a few days before the appointment and migraine headaches at the rate of approximately once every two weeks (Tr. 231). A physical examination was unremarkable (Tr. 231).

Dr. Robles February, 2011 treating records note Plaintiff's report that he had not had a syncopal episode since a December, 2010 appointment (Tr. 227). Plaintiff reported side effects from Inderal, and that Zoloft did not help his symptoms, but noted reduced symptoms of syncope and migraine headaches (Tr. 227, 254). In March, 2011, Plaintiff reported one fainting spell since December, 2010 (Tr. 252). A physical examination was unremarkable (Tr. 252). In May, 2011, neurologist Douglas J. Gelb, M.D. noted Plaintiff's report of a one-year history of vertigo, tunnel vision, and the inability to move while remaining conscious (Tr. 241). He prescribed Tompiramate for the neurological symptoms (Tr. 242). An

October, 2011 EEG was unremarkable (Tr. 243). Dr. Robles' December, 2011 treating notes state that Plaintiff had not passed out recently but experienced lightheadedness "a few times each week" and migraine headaches three to four times a month (Tr. 246). Plaintiff reported that the headaches were "aborted" within 30 to 45 minutes after taking Imitrex and less lightheadedness since beginning Florinef (Tr. 246). A physical examination was unremarkable (Tr. 246).

### C. Vocational Testimony

VE Joanne Pfeffer characterized Plaintiff's former work as a corrections officer as semiskilled and exertionally medium; material handler, semiskilled/heavy; and forklift operator, semiskilled/medium (light as performed)[1] (Tr. 53). The VE stated that if an individual of Plaintiff's age, education, and work experience were limited only by the need to avoid concentrated exposure to the operation control of moving machinery and unprotected heights, Plaintiff former work as a forklift operator would be eliminated (Tr. 53). The ALJ then described a hypothetical individual of Plaintiff's age, education, and work experience limited by the need to avoid moving machinery and unprotected heights:

---

[1] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

> [Limited to lifting] 10 pounds occasionally, standing and walking for about two hours and sitting for up to six hours in an eight-hour work day with normal breaks, could such a person perform [Plaintiff's] past work? (Tr. 54).

The VE responded that the limitations would preclude all of Plaintiff's former jobs but would allow the above-described individual to perform the unskilled, exertionally sedentary work of a telephone quote clerk (19,000 positions in the lower peninsula of Michigan); sedentary inspector (18,000); and surveillance monitor (1,170) (Tr. 54). The VE testified that if the above-described individual were able to lift up to 20 pounds occasionally and 10 frequently (exertionally light work), he could perform the above-stated sedentary jobs and additionally, work as a parking lot attendant (1,800) and gate attendant (1,400) (Tr. 55).

### D. The ALJ's Decision

Citing the medical records, ALJ Jones found that Plaintiff experienced the severe impairment of ischemic heart disease but determined that the condition did not meet or equal a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 16). The ALJ determined that Plaintiff had the Residual Functional Capacity ("RFC") for light work with the following additional restrictions:

> [C]laimant can only stand/walk for about 2 hours and sit for up to 6 hours in an 8-hour workday with normal breaks; avoiding concentrated exposure to hazards, moving machinery, and unprotected heights (Tr. 16).

Citing the VE's testimony, the ALJ determined that while Plaintiff was unable to perform his past relevant work, he could work as a telephone quote clerk, inspector, or surveillance

monitor (Tr. 20).

The ALJ discounted Plaintiff's allegations of disability. He cited Plaintiff's November, 2010 statement that he had not experienced a fainting episode during or since a September, 2010 office visit (Tr. 18). The ALJ noted that diagnostic testing performed in July and August, 2010 and an October, 2011 electroencephalogram study were normal (Tr. 18). He cited December, 2011 treating records stating that the migraine headaches improved with the use of Imitrex (Tr. 18). The ALJ noted that Plaintiff continued to hold an unrestricted driver's license, took three college courses at a time, and held a 3.5 grade point average (Tr. 19).

### III. STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into

account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV. FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V.  ANALYSIS

Plaintiff makes three arguments in favor of remand.  First, he argues that the ALJ non-disability determination was based on a distortion of the medical evidence.  *Plaitniff's Brief* at 13-15, *Docket #9.*  He contends second that the ALJ's credibility determination was likewise based on a slanted view of the medical records.  *Id.* at 15-19.  In his third argument, he contends that the ALJ breached his "special duty" to fully develop the record as required when questioning an unrepresented claimant.  *Id.* at 19-20 (citing *Lashley v. HHS,* 708 F. 2d 1048, 1051-1052 (6th Cir. 2000)).

**A.  The ALJ's Review of Medical Records**

Plaintiff faults the ALJ's reliance on the medical records showing that he did not lose consciousness more than a handful of times since the alleged June, 2010 onset of disability. He contends that the ALJ erred by failing to make a distinction between the rare episodes of loss of consciousness ("full syncope") and the more frequent "near syncopal" episodes occurring two to four times a week, followed by migraine headaches and fatigue.  *Plaintiff's Brief* at 3-10, 13-15.  Plaintiff has submitted a chart of his allegations of "full syncopal" episodes, severe migraines," and "near syncopal" episodes to various medical sources between July, 2010 and December, 2011.  *Id.* at 8.

The ALJ's citation of the medical evidence in support of his determination does not amount to a misreading or distortion of the record.  First, while Plaintiff reported frequent "near syncopal" episodes to Dr. Robles between July and December, 2010 (Tr. 178-181, 229-

-11-

237), his description of the symptoms did not prevent Dr. Robles from opining in December, 2010 that Plaintiff was capable of jobs not involving inmates, climbing, or driving within six months of a blackout (Tr. 216, 231). The RFC crafted by the ALJ, including "avoiding concentrated exposure to hazards, moving machinery, and unprotected heights," generously encompasses Dr. Robles' opinion (Tr. 16).

While Plaintiff's contends that the ALJ did not sufficiently distinguish the syncopal and "near syncopal" episodes, he ignores Dr. Robles' treating opinion that neither the syncopal nor the allegedly frequent "near syncopal" episodes prevented Plaintiff from working. Further, the more recent treating records do not indicate that Plaintiff's condition worsened after Dr. Robles issued his opinion. Subsequent to December, 2010, Plaintiff reported reduced symptoms from both migraine headaches and syncope-related conditions with the use of medication (Tr. 227, 246). Clinical examinations and imaging studies performed subsequent to December, 2010 were wholly unremarkable. Plaintiff's argument that the ALJ's determination relied on a distorted or incomplete reading of the treating records is without merit.

### B. The Credibility Determination

Plaintiff's argument that the ALJ used "boilerplate" language in discounting the allegations of limitations is not well taken. *Plaintiff's Brief* at 15-19.

The credibility determination, guided by SSR 96-7p, describes a two-step process for evaluating symptoms. "First, the adjudicator must consider whether there is an underlying

medically determinable physical or mental impairment. . .that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 1996 WL 374186 at *2 (1996). In regard to the first prong, the ALJ properly acknowledged the condition and treatment for ischemic heart disease (Tr. 16-17).

The second prong of SSR 96-7p directs that when a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the testimony must be evaluated "based on a consideration of the entire case record." 1996 WL 374186 at *2.[2] In regard to this prong, the ALJ's reasons for rejecting the unsupported allegations of disability were well articulated. Plaintiff contends that the determination was limited to a conclusory statement that his allegations were not credible. However, in making this argument, he cites only one sentence from the concluding paragraph of a 10-paragraph discussion of why his claims of limitation were only partially credited (Tr. 17-19). In support of the credibility determination, the ALJ

---

[2]In addition to an analysis of the medical evidence, C.F.R. 404.1529(c)(3) lists the factors to be considered in making a credibility determination:

(i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms ... and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

acknowledged the abnormal table tilt test, but that the other objective studies yielded uniformly normal results (Tr. 16-18). The ALJ acknowledged Plaintiff's claims that he had episodes of dizziness, nausea, and fainting (Tr. 17), but noted that the claims of ongoing and frequent neurological disturbances were not borne out by the treating and examining observations (Tr. 17-18). The ALJ also observed that Plaintiff held an unrestricted driver's license and had a 3.5 average at a local community college (Tr. 19). He reasonably found that Plaintiff's ability to take a significant load of college courses (Tr. 31) stood at odds with his claim that he was unable to perform any work (Tr. 19).

My own review of the transcript supports the ALJ's credibility determination. The Plaintiff's testimony, standing alone, supports the inference that he is not disabled. He acknowledged that he had been advised to seek work that would accommodate his condition (Tr. 32). He admitted that he had motivational problems remaining physically active (Tr. 37-38). Plaintiff testified that he currently received $4,000 in disability insurance each month and cited "decreased earnings" among the reasons that he did not apply for work (Tr. 40). His ability to take three classes at a time toward a business degree for the purpose of obtaining a job in new field, while commendable, also suggests that he chose spend his time in retraining rather than looking for work. While Plaintiff claimed toward the end of the hearing that he was physically unable to perform any work, he earlier admitted that he was "not totally sure" if he was unable to perform a desk job (Tr. 38). Read in context, Plaintiff's testimony that he was still "holding out hope" that he would eventually be able to return to

the corrections officer job, while understandable, supports the inference that he was unmotivated, rather than unable, to pursue other work (Tr. 38). Because the ALJ's findings are well supported and articulated, the deference generally accorded an ALJ's credibility determination is appropriate here. "[A]n ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'" *Cruse v. Commissioner of Social Sec.*, 502 F.3d 532, 542 (6th Cir.2007)(citing *Walters v. Commissioner of Social Sec.,* 127 F.3d 525, 531 (6th Cir.1997)). See also *Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1234 (6th Cir.1993); *Anderson v. Bowen,* 868 F.2d 921, 927 (7th Cir.1989) (citing *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir.1986)) (An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record' ").

### C. The ALJ's "Heightened Duty"

Plaintiff, who appeared *pro se* at the administrative hearing, argues that the ALJ breached his "heightened duty" to develop the record as required when questioning an unrepresented claimant. *Plaintiff's Brief* at 19-20 (citing *Lashley, supra,* 708 F.2d 1051-52). He contends that the ALJ's questioning was "adversarial." *Id.* at 20.

Plaintiff is correct that administrative proceedings "are inquisitorial rather than adversarial." *Sims v. Apfel,* 530 U.S. 103, 110-111, 120 S.Ct. 2080, 2085, 147 L.Ed.2d 80 (2000); *Richardson*, *supra,* 402 U.S. at 400–401. "It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." Further, although he

cannot properly assume the role of counsel, "[h]e acts as an examiner charged with developing the facts." *Lashley,* 708 F.2d at 1051; *Richardson* at 411. Where a claimant is unrepresented at the hearing, "the ALJ has a duty to exercise a heightened level of care and assume a more active role" in the proceedings. *Lashley,* at 1051.

Plaintiff's claim that the ALJ's questioning "took the tenor of an adversarial cross-examination" does not provide grounds for remand. *Plaintiff's Brief* at 20. Plaintiff's cites transcript pages 36 to 37 and 59 to 60 in support of this argument. However, the first passage cited by Plaintiff consists only of the ALJ's query regarding the alleged symptoms as reported to an examining source in May, 2011 and Plaintiff's testimony regarding the duration and intensity of the symptoms and his current medication (Tr. 36-37, 241).

Plaintiff also objects to the ALJ's observation that he had not attempted to apply for other work (Tr. 59). However, the ALJ's inference was based on Plaintiff's earlier testimony that he had refrained from applying for other work despite recommendations to obtain work in a new field and was "not sure" whether he could perform a desk job (Tr. 32, 38). Further, after asking Plaintiff why he had not applied for other work, the ALJ allowed Plaintiff to testify that he had not attempted to find a job because he was unable to work, he would be required to call in sick "two or three times a week," he was unable to care for his child due to near syncope-type episodes, and his medications were not yet "under control" (Tr. 59-60). Although Plaintiff objects to the ALJ's inference that he was unwilling rather than unable to work, substantial evidence (particularly portions of administrative testimony) support the

ALJ's Step Five determination.

In closing, my recommendation to uphold the Commissioner's decision is not intended to trivialize Plaintiff's condition or inability to return to his former job as a corrections officer. Nonetheless, the ALJ's determination that he was capable of a significant range of other work is generously within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## VI. CONCLUSION

I recommend that Defendant's Motion for Summary Judgment [Docket #13] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #9] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D.

Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

                                        s/R. Steven Whalen  
                                        R. STEVEN WHALEN  
                                        UNITED STATES MAGISTRATE JUDGE

Dated: August 14, 2014

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on August 14, 2014, electronically and/or by U.S. mail.

                                        s/Carolyn M. Ciesla  
                                        Case Manager to the  
                                        Honorable R. Steven Whalen